WOOLBERT *et al. v.* LEE LUMBER Co. *et al.*\*

(Division B. June 4, 1928.)

[117 So. 354. No. 27057.]

58

*Corpus Juris-Cyc. References: Executors and Administrators, 24CJ, p. 292, n. 78; Husband and Wife, 30CJ, p. 602, n. 92; Insane Persons, 32CJ, p. 726, n. 34; p. 737, n. 20, 24; p. 746, n. 12; p. 761, n. 80; Mortgages, 41CJ, p. 643, n. 86; As to what circumstances will charge one with notice that the other contracting party is of unsound mind, see annotation in 31 L. R. A. (N. S.) 1159; 46 A. L. R. 419; 14 R. C. L. 584; 3 R. C. L. Supp. 252; 6 R. C. L. Supp. 825; 7 R. C. L. Supp. 465. Restoration of *status quo* as condition of avoidance of contract of incompetent, see annotation in 34 A. L. R. 1403; 14 R. C. L. 584.

*Maynard, FitzGerald & Venable,* for appellants.

*Wells, Stevens & Jones, Cutrer & Smith* and *John W. Crisler,* for appellees.

Argued orally by *W. M. Venable,* for appellant, and *L. B. Jones* and *Edw. Smith,* for appellees.

ETHRIDGE, P. J. L. Woolbert, the husband of the appellant, formerly residing at Cleveland, Miss., had purchased a lot in Clarksdale, Miss., and after such purchase entered into a verbal contract with the Tri-States Construction Company to build a residence for him on the lot for the price agreed upon, to be paid upon the completion and acceptance of the residence. After the construction work had been begun on the house, L. Woolbert conveyed the property to the appellant; the deed bore date of February 9, 1921, and was recorded on the same day.

The Tri-States Construction Company entered upon the performance of its contract, and purchased the materials for the building from the Lee Lumber Company, at Memphis, Tenn. The first material appears to have been purchased on the 22d of November, 1920. On that date L. Woolbert, the Lee Lumber Company, and the Tri-States Construction Company entered into an agreement wherein the indebtedness of the Construction Company to the Lee Lumber Company was recited, and all of the parties agreed that ten thousand dollars, the price of the building, would be reserved by L. Woolbert, to be

paid to the Lumber Company upon completion of the building, in consideration of which the Lumber Company agreed to furnish the Construction Company and L. Woolbert the lumber necessary to complete the residence. It was further provided that, if the Construction Company failed or refused to provide the materials, other than those to be provided by the Lumber Company, with promptness, the Lee Lumber Company was to have the right to take over the work, charging the Construction Company with lumber and material.

After this, on the 14th day of March, 1921, a supplementary agreement in writing was entered into by the same parties, wherein it was recited that there was due on the building for extras nine hundred ninety-one dollars. It was further recited that the total indebtedness, due by L. Woolbert when the building should be completed, would be ten thousand nine hundred ninety-one dollars, and it was recited that the claim of the Construction Company had been assigned to the Lee Lumber Company, and that the balance of the contract price for the building, ten thousand nine hundred ninety-one dollars, should be paid to the Lumber Company sixty days after acceptance of the building, or, if possible, sooner.

Some time after the foregoing transaction, and prior to December 22, 1921, L. Woolbert applied to the Lamar Life Insurance Company for a loan of eight thousand dollars, to be secured by a deed of trust on the residence in question. The loan was approved, and the deed of trust was signed, or purported to be signed, in the names of L. Woolbert and Minnie Woolbert; the latter signing by mark, according to the face of the paper. Of the amount borrowed from the Lamar Life Insurance Company, six thousand nine hundred ninety-one dollars was paid to the Lee Lumber Company, leaving a balance due L. Woolbert to the Lumber Company, according to the sum agreed to be paid to it by the written agreement previously mentioned.

There were certain items in dispute, and L. Woolbert agreed to, and did, execute notes and a deed of trust purporting to be signed by L. Woolbert and Minnie Woolbert; the notes calling for five thousand dollars, secured by a deed of trust on the property involved. These notes and the deed of trust were also signed by Minnie Woolbert by mark, and appear to be dated January 17, 1922. One of the notes to the Lee Lumber Company was paid by L. Woolbert, leaving unpaid four notes, of one thousand dollars each.

On April 24, 1922, the architect certified the acceptance of the building. On the 25th day of May, 1923, L. Woolbert and Minnie Woolbert—the latter signing by mark—entered into a written agreement with the Lee Lumber Company, by which all differences were settled, and the house accepted by the Woolberts, according to their agreement. Later, default having been made in payments of installments of indebtedness due, the Lamar Life Insurance Company and the Lee Lumber Company both began foreclosure proceedings under their respective deeds of trust.

Mrs. Minnie Woolbert, by next friend, filed her bill against the defendant, asking that the foreclosure be enjoined, and the deeds of trust and notes canceled and praying for general relief, setting up, as ground for the relief prayed, that she had never signed the notes, and had never acknowledged the deeds of trust, and that she had never appeared before the notary public, and, as a matter of fact, had never signed the instruments at all. She further claimed that she was insane to such an extent as to be incapable of entering into a valid contract, and totally incapable of attending to business.

The Lee Lumber Company and the Lamar Life Insurance Company each answered, making their respective answers cross-bills. On the trial of the cases, by agreement, the two cases were consolidated and tried together;

the Lamar Life Insurance Company defending the suit on the following grounds:

(1) They denied that Minnie Woolbert was insane and unable to understand or appreciate the nature of her acts.

(2) That they had no knowledge of her insanity, and were incumbrancers in good faith and innocent holders for value.

(3) That the complainant could not maintain her action, because she had not restored, or offered to restore, the *status quo ante*, by offering to refund the consideration received by her.

(4) That she was liable for same as a necessity.

(5) That the Tri-States Construction Company had a mechanic's and materialman's lien to secure the contract price of the house; and that L. Woolbert, without consideration, conveyed the property to Minnie Woolbert, and that the Tri-States Construction Company assigned its rights under the contract to the Lee Lumber Company, and that the Lamar Life Insurance Company lent money to L. Woolbert and wife to pay off his indebtedness, and that to the extent of this loan the Lamar Life Insurance Company became subrogated to a mechanic's and materialman's lien.

They further asked for certain sums to be decreed against Minnie Woolbert and her property for interest on the loan and for money expended for insurance and taxes.

The Lee Lumber Company answered, by denying the insanity of Minnie Woolbert, and denying that she had not executed the notes; second, that in the construction of the house the Lee Lumber Company had furnished lumber, materials, etc., in the sum of sixteen thousand three hundred fifty-eight dollars and sixty-six cents, upon which there had been a payment of six thousand nine hundred ninety-one dollars—and set up the execution of the notes and deed of trust to the Lee Lumber Company,

admitting that one of the notes had been paid, leaving a balance of the four notes, of one thousand dollars each, and pleading certain sums to be paid for insurance.

Making its answer a cross-bill, it asks that, if it is not entitled to proceed with a foreclosure of the property, then it asks for a decree against complainant for the full amount of material and labor furnished, less the payment of six thousand nine hundred ninety-one dollars, increased by what had been paid for insurance, etc., making a total of nine thousand four hundred sixty-four dollars and forty-six cents, with interest thereon.

There was a great deal of testimony taken in the case, the record being voluminous, and the chancellor found that Minnie Woolbert was insane, and ordered the cancellation of the deed of trust and the notes. He decreed, further, that Minnie Woolbert was in no wise personally liable for any of the indebtedness, either to the Lamar Life Insurance Company or to the Lee Lumber Company. Third, he held, however, that, in order to place the parties *in statu quo ante,* the Lee Lumber Company and the Lamar Life Insurance Company were entitled to have the property sold for the purpose of satisfying their claims. Fourth, he decreed a lien in favor of the Lee Lumber Company for the following amounts: (a) nine thousand two hundred twenty-six dollars and sixteen cents, being the amount of the entire material, labor, etc., incurred in constructing the building; (b) interest thereon from April 24, 1922, to the date of the decree, amounting to two thousand seven hundred sixty-seven dollars and forty-eight cents; (c) four hundred twenty-nine dollars and sixty-five cents, being money paid for insurance on the building and for redemption from tax sale—making a total of twelve thousand four hundred thirty-three dollars and thirty-nine cents. Fifth, he decreed a lien in favor of the Lamar Life Insurance Company for the following amounts: (a) five thousand nine hundred ninety-one dollars, the sum paid the Lee Lumber Company by

L. Woolbert from the loan obtained, in partial discharge of its claim for labor and material; (b) interest at six per cent. from January 19, 1922, to date of decree, amounting to one thousand nine hundred forty-seven dollars and seven cents; (c) one thousand eighty-six dollars and fifty cents, as money paid for taxes on the property; (d) interest on this sum at six per cent. from the date of the decree, amounting to two hundred three dollars and twenty-four cents; (e) six hundred dollars and eighty-four cents for insurance on the property by the Lamar Life Insurance Company, and six per cent. interest thereon, amounting to one hundred twenty-nine dollars and fifty-seven cents, making a total of nine thousand nine hundred fifty-eight dollars and twenty-two cents— and declared liens upon the house and lot for these amounts, and ordered the same to be sold to satisfy said decree.

A commissioner was appointed and ordered to sell the said property, which he has since done, the sale reported to the court, exceptions to the report filed, the sale confirmed, and appeal granted from the order of confirmation.

It is earnestly and ably argued by the appellee and the cross-appellant that the evidence was insufficient to show the insanity of Mrs. Woolbert. We have carefully examined the evidence in the record as to the insanity of the appellant, and think there was ample proof to sustain the decree of the chancellor that she was insane, to the extent of rendering her incompetent to transact business and to understand the nature of a business contract.

It is next contended that the Lamar Life Insurance Company and the Lee Lumber Company are innocent purchasers or incumbrancers of the property without notice of the complainant's insanity, and that they should be protected as *bona-fide* purchasers on that account. This contention cannot be upheld. In *Brantley* v. *Wolf,*

60 Miss. 420, the court was confronted by the case of a minor or infant, in which this contention was advanced. The court held that the act of the minor in standing by and seeing buildings erected upon land which he has sold and conveyed, without making objection thereto, does not estop him to disaffirm the conveyance upon arriving at his majority; that where one, having made a contract during his minority, disaffirms it upon the attainment of his majority, it is not an unreasonable delay for the vendor within two years to disaffirm; and the fact that the land was bought by the second vendee after the vendor had attained his majority would make no difference, where the latter was ignorant of such second purchase.

It is further held that, where a person made the contract during his minority, and disaffirms it upon attaining his majority, he must return the consideration which he has received therefor, if he has it at the time of attaining his majority, or of the act of disaffirmance, and if, after the attainment of his majority, he retains for an unreasonable time or disposes of it, that will amount to a ratification of his previously voidable contract; and it is further held that the purchaser of land from an infant's vendee paid a valuable consideration therefor, in ignorance of the rights of the infant vendor, does not protect such subsequent purchaser against the right of the infant vendor to disaffirm the conveyance when he has attained his majority. At page 433 of this report the court said:

"If the minor has in possession any of the consideration received, when he disaffirms his contract, or after he becomes of age, he must return it. By the act of disaffirmance he loses the right to retain that which has been received, and if he holds onto the consideration, or disposes of it after majority, it will amount to a ratification of his previously voidable contract. But if he has lost or squandered the consideration during minority, this is nothing more than the law expects of him, and

he cannot be required to purchase the right of reclaiming his own by still further abstractions from his estate. Such a rule would practically strike down the shield which the law, by reason of his inexperience and youth, throws around him. Neither as to executed nor executory contracts is he required to return the consideration, where it passed from him during minority.''

In *Jackson et al.* v. *Banks,* 144 Miss. 392, 109 So. 905, the court was dealing with the case of an insane person, and held that the disability of insanity was like that of infancy. At page 397 in the opinion (109 So. 905) the court said: ·

''Infancy and lunacy are disabilities similar in their effect on the contracts of the parties, and we see no good reason why a different rule should be applied to the contracts of a person *non compos mentis* from that applied in the case of infants. In the case of *Conn* v. *Boutwell,* 101 Miss. 353, 58 So. 105, after an extensive consideration of the authorities, this court approved as the true rule the announcement in *Brantley* v. *Wolf,* 60 Miss. 420, that 'the right of an infant to void his contract is an absolute and paramount right, superior to all equities of other persons, and may therefore be exercised against a *bona-fide* purchaser from the infant's grantee.'

''In discussing this question, the court there also said that 'when an infant conveys land, the title to which is in him, in the eye of the law there is no conveyance— not void, it is true, but voidable; and consequently it is not at all necessary for the infant to go into the chancery court to disaffirm his conveyance, but he has a right to bring an action of ejectment for the recovery of the land, and he is permitted to recover upon the idea that he never made any legal conveyance of the property.' Applying this rule to the facts in the case at bar, we think it necessarily leads to the conclusion that the deed of trust executed by the appellants to the defendant J. A.

Wiltshire [see page 397 of 144 Miss.] is not enforceable against the land in question.''

This last decision is said to be erroneously decided, if it decided, as we think it does, that insanity is covered by the same rule as the disability of infancy. It said that insanity is a question of fact, to be determined, and it argued that persons can be greatly imposed upon if they judge by appearances, and deal with a lunatic, and it afterwards turns out that he is insane, and can, under such circumstances, repudiate the contract on the same terms as a minor can. That minority is a disability of law. Both minority and insanity are recognized as ground of disability in law, but each must be determined by fact—that is, the fact must determine whether the person is an infant or not. The facts must also determine whether a person is insane or not. When it is established, then the law operates to protect him from the consequences of his disability. We think the decision is sound, and are not disposed to disturb it.

It is next contended by the Lamar Life Insurance Company that the complainant must restore the *status quo ante,* or offer to restore it, before being entitled to maintain a bill for recission of contract. This contention is not supported by the decisions of this state. The contention finds support in decisions of some other states, but our court is committed to the doctrine that an infant or a lunatic, who has squandered the consideration, is not called upon to restore the *stalu quo ante.*

In *Bates* v. *Hyman* (Miss.), 28 So. 567, the court announced the following rule with reference to the subject:

''1. Where a vendee of merchandise was insane at the time of giving notes and trust deeds to secure the price, an offer to restore the property was not a condition precedent to a right to avoid the deed.

''2. A stipulation in a note that the maker would pay an attorney's fee in case of suit on the note fails, where

the contract under which the note was given was void for insanity of party.

"3. Where defendant purchased certain chattels, giving a note secured by trust deed on the chattels and on certain land, and it appeared that he was insane at the time of executing the note and the trust deed, the relief accorded the vendors thereunder should be limited to a decree for the sale of the chattels."

The court in the opinion said: "We are satisfied from the record that A. J. Bates was insane on September 2 and 3, 1896, when the two notes and trust deeds securing them were given. We do not think it is shown that appellees knew this, or were chargeable with knowledge of it. This bill—in so far as it seeks to enforce the contract, the note and trust deed made to the bank—must therefore fail. *Ricketts* v. *Jolliff*, 62 Miss. 448, and authorities; *Hines* v. *Potts*, 56 Miss. 346; *Hovey* v. *Hobson*, 53 Me. 453, 89 Am. Dec. 705; *Flanders* v. *Davis*, 19 N. H. 139; *Gibson* v. *Soper*, 6 Gray [Mass.] 279, 66 Am. Dec. 414; *Breckenridge's Heirs* v. *Ormsby*, 1 J. J. Marsh. [Ky.] 245, 19 Am. Dec. 71; *Dexter* v. *Hall*, 15 Wall. 9, 21 L. Ed. 73. And no offer to return is a condition precedent to the right to avoid the deed. That right is paramount. See, specially, *Hovey* v. *Hobson*, *supra*. Of course, the stipulation as to attorney's fees falls with the contract. [*American Freehold Land &*] *Mortgage Co.* v. *Jefferson*, 69 Miss. 770, 12 So. 464 [30 Am. St. Rep. 587]."

In *Simonton* v. *Bacon*, 49 Miss. 582, fifth headnote, it is said: "The general rule is that, when there is a rescission of the contract, the parties should be placed *in statu quo*. Where that cannot be done specifically, some other relief, which will administer justice, may be substituted."

In paragraph 6 it is said: "The general rule is that restitution is not a condition precedent to a recovery of

the property conveyed. Nor is it necessary that the complainant should tender with his bill the consideration paid him."

At pages 589 and 590 the court says: "Upon the rescission of the contract the general rule is that parties must be put *in statu quo*. Where that cannot be done specifically, some other relief, which will administer justice may be afforded. If a lunatic seeks to avoid a contract, certainly he should not retain the fruits and advantages of the bargain. If the consideration money, arising from the sale of land, has been invested in other property, the lunatic should not retain the land and hold on also to the property acquired with the money. Nor, on the other hand, if, because of the mental infirmity, he has wasted or destroyed the money, or other thing, receiving no good or benefit therefrom, should he be held to a restoration. If, however, he has realized a substantial benefit, to that extent should he or his estate make restitution."

In *Ricketts et al.* v. *Jolliff*, 62 Miss. 440, the court announced the following rule: "Restitution of the consideration received by the insane person is not a condition precedent to the rescission of such contract or conveyance, if it has been wasted or has passed beyond his control."

The court said, on page 449: "To require, as an inflexible rule in such case, that the parties shall be placed *in statu quo,* would be but little better than the long since exploded doctrine, which at first would not permit one to stultify himself, as it was termed, by pleading his own incapacity, and afterward recognized no degree of mental alienation, short of a total loss of reason and understanding, as sufficient to invalidate a contract on that account."

From these cases, and others referred to in the briefs, it appears that, where an insane person disaffirms a contract entered into, he must restore the consideration received, if he still has it. But it is not a condition precedent

to disaffirming it. And, if he has squandered the consideration entirely, he can disaffirm without restoring the consideration so dissipated. If he has a part of the consideration, and it is in such form or condition that it cannot be restored to the party, equity will afford relief commensurate with the benefit so held at the time of the disaffirmance.

Applying these principles to the case before us, we think that the chancellor erred in allowing the full amount of the account, taxes, and insurance, with interest thereon, and in decreeing the property to be sold for these amounts. It appears to us that the proper relief would have been to determine the value of the lot without the house, and then determine the value of the lot with the house, taking the difference as the basis for determining the benefits conferred upon the estate of the lunatic.

The amount due the complainants should be compared to the total cost of the construction of the house, and they should be given relief by fixing such proportion as the money advanced by the appellees bears to the total cost of the construction of the house, and taking that percentage of the value represented by such comparison, and applying it to the value of the property as it stood at the time the cross-bills were filed, and that this sum should not have been charged, with interest.

The appellant should also have been charged with the money expended in paying taxes, in order to preserve the property, with interest upon this sum from the date of payment to the date of the decree; but the court should not have allowed the item expended for insurance. Insurance is a desirable convenience and protection, but is not a necessity, and we know of no right, outside of contract rights, by which any creditor of a person may charge the owner of a building with premiums paid out for insurance. The right, it is true, is usually given in mortgages and deeds of trust, and frequently in other

contracts. It is a general and common thing in business transactions to provide for the insurance of property as a protection of the lienholder. However, there is no law authorizing a creditor to charge his debtor with insurance premiums, to be charged against the account and property of the debtor, apart from a contract. Where the creditor has the lien or other interest in the property, he has an insurable interest, and may take insurance for his own protection; but in the absence of contract right he cannot charge the debtor with the money so expended. In the case before us, these premiums were paid for past transactions, and the money had been expended. It could not be said that the appellant was in possession of the benefits of the insurance at the time. We think it was error to allow the sum expended in insuring the property and the interest thereon.

It is urged by the appellee, on cross-appeal, that the house is a necessity for a lunatic or minor; that they must have a home, and that protection of a home is a necessity for the welfare and convenience of an insane person or a minor. We do not think this doctrine comes within the rule governing necessities. A large per cent. of the people of the state own no homes, and certainly it would not be a necessity which persons may build for a lunatic or a minor, and charge the estate with. Especially is this true of homes costing in excess of amount exempted to householders.

In the case before us the appellant is a married woman, and it is the duty of her husband to provide her necessities, and to provide a home for her. It would certainly be a novel extension of the doctrine of necessities to make it applicable to a case like this, where debts amounting to sixteen thousand dollars and seventeen thousand dollars are sought to be justified under the doctrine of necessity, when the law allowing homestead exemptions to heads of families fixes the maximum at three thousand dollars. It will also be noted, in connection with this

argument, that homesteads are only exempted in favor of heads of families, and not in favor of mere individuals.

Inasmuch as the mechanic's lien contended for under the doctrine of subrogation has expired by limitation, and inasmuch as there was no contract between the appellants and the appellees, the contention that the mechanic's lien should be recognized in favor of the appellees, and foreclosed for the full amount, cannot be sustained. The parties chose their security, and must stand upon the security so taken, with the equity of restitution as above indicated in the opinion. We know of no authority that would warrant us in extending the liens of mechanics and materialmen beyond the statutory period, unless some element of estoppel would arise. See *Ehlers* v. *Elder,* 51 Miss. 495. The chancellor predicates his decree upon the doctrine of equitable restitution. His theory of equitable restitution was correct, but he erred in the application of that doctrine to the facts before him.

The judgment will therefore be reversed, and the cause remanded to the court below for proceedings in accordance with this opinion. And the decree ordering the sale and the confirmation thereof is set aside for a finding of the amount due under the principles here announced, after ascertaining which the chancellor will decree a lien upon the property for the corporate amount, and may order the same sold to satisfy that amount; but out of the proceeds of the sale, when made, the appellants will be allowed the value of the lot, at all events, from the proceeds of the sale.

*Reversed and remanded.*